JONAS J. WHITE, Appellant, v. JOHN LOUDON and Others, Respondents.

*Vendor and purchaser — opinion as to the value of real estate — when a fraudulent statement of fact — diligence required of a defrauded vendee.*

Mere statements as to the value of real property made in negotiations for the sale thereof, standing alone and made without fraudulent intent, in a case where the property is equally open for examination to all, and where the party who makes the representations had no superior knowledge, and does not speak as an expert, cannot afford ground for an action against the vendor when the statements prove to be false.

Where, however, the parties do not stand upon an equal footing as to facilities for examination, and the purchaser must, to some extent, depend upon the opinion of the seller in determining whether he will purchase, statements made by the vendor with a view to influencing and which do influence the purchaser become statements of fact; and if they are false and are intended to and do defraud the purchaser, he may recover damages from the seller.

Where a vendee has been induced to purchase property by fraud, mere want of diligence in discovering the fraud will not deprive him of the right to rescind the contract; but he must act promply after he actually discovers the fraud.

APPEAL by the plaintiff, Jonas J. White, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Erie on the 27th day of April, 1894, upon the decision of the court rendered after a trial at the Erie Special Term.

The action was brought to compel the specific performance of a contract for the purchase of real estate. The defendants alleged that they had been induced to enter into the contract by means of fraudulent representations made to them by the plaintiff's agent, and they demanded that the contract be rescinded and that they recover as damages the amounts theretofore paid by them upon such contract.

*George Clinton,* for the appellant.

*George H. Frost,* for the respondents.

Present — LEWIS and BRADLEY, JJ.; WARD, J., not sitting.

Judgment affirmed on opinion of WARD, J., at Special Term.

The opinion of WARD, J., was as follows:

WARD, J.:

The plaintiff resided in Buffalo, N. Y., and the defendants interested in the contract under consideration all resided at or near Altoona in the State of Pennsylvania, a distance of about 375 miles by the usual traveled route from Buffalo.

On the 16th day of April, 1892, the plaintiff was the owner, subject to a $10,000 mortgage, of twenty-three acres and a half of land situate between the northern corporate limits of the city of Buffalo and the southern corporate limits of the village of Tonawanda, in the county of Erie, N. Y., said limits being from three to four miles apart, and the lands situate about midway between them, being on lot 39, fronting east on Delaware avenue, and extending west across Elmwood avenue to the Military road.

The plaintiff instructed one William R. Johnson, a real estate broker in Buffalo, who had been in the business there a year or two, and who was familiar with the property and the lands surrounding it, to sell or syndicate the property, for which service Mr. Johnson was to receive $100 per acre.

About the sixteenth of April, aforesaid, a contract was prepared in Buffalo for the sale of the said lands at $2,300 an acre, payable in monthly payments, covering a period of fourteen months, after a payment of about $3,000 down, and at the end of which payments a bond and mortgage was to be given for the balance on the property of $10,000. The contract was all complete except the names and signatures of the purchasers, having been signed and sealed by the plaintiff and delivered to the said Johnson. Johnson proceeded to Altoona, where he had some friends, obtained an introduction to the defendants, and had personal interviews with seven of them, and an interview with a cousin of the eighth, Mrs. Dysart, a lady defendant. None of these defendants had any knowledge of the property in question, or its surroundings, and were, therefore, obliged to rely entirely upon Johnson's statements as to the quality, amount, value and condition of the land and of the surrounding territory, and of the prospects as to the advance of land in the future. Johnson represented to all these parties that he was authorized as the agent of the plaintiff to sell the premises, and pointed out to them substantially its location upon a map or paper which he had,

and told them that nearly all of the lands in the vicinity and surrounding the premises had been taken or bought up, and were held for higher prices than $2,300 per acre; that the premises were worth that amount per acre, and that it was low at that price. There were some variations in his statements to the several defendants, but not to any great extent, which appear in the findings of fact herein. In addition to these statements he gave most encouraging accounts of the future prospects of the territory between Buffalo and Tonawanda, and expressed the opinion that the defendants would be able to realize within a short time a handsome profit on their investments by re-syndicating it or otherwise. The statements of Johnson as to the value of the property and his assertion that surrounding property was being held for higher prices than $2,300 per acre made such impressions upon the defendants that they entered into the contract, relying upon the truthfulness of the same. How much importance they attached to Johnson's statements as to the future prospects does not clearly appear, but that they did rely upon the other statements, and without such statements would not have entered into the contract, was manifest from the evidence. Johnson returned to Buffalo with the contract signed, and the defendants, without making further investigations of importance as to the property or as to the truth of the representations made to them, made six monthly payments upon the contract, commencing with April 16, 1892, and ending September 16, 1892, paying in all $17,660.40.

After the September payment they began to discover that fraud had been perpetrated upon them through the representations of Johnson; they refused to make further payments, repudiated the contract for fraud, and in February following this action was commenced, setting up the contract, the amount paid thereon, the amount still due thereon, and demanding performance on the part of the defendants, or in case of their failure to perform, that the contract be foreclosed and the defendants deprived of all right and equity in the contract.

The defendants answered, alleging that they were induced to enter into the contract by means of the aforesaid representations, which they alleged to be false and fraudulent, and asked that the contract be rescinded and canceled for such fraud, and that they recover as damages the amount paid in by them upon the contract with interest.

The defendants had never had possession of the property or received any benefits therefrom. These issues were tried by the court at Special Term, and upon the trial the defendants, by an instrument in writing, offered to surrender and reassign to the plaintiff all right or claim they might have under the contract to the land, and tendered the said instrument to the plaintiff, which he refused to accept.

It is strenuously contended by the learned counsel for the plaintiff that the statements of Johnson, as to the value of the land, were mere expressions of opinion, and as such cannot be considered in any sense as representations of fact. While it is true that mere statements as to the value of property in negotiations for sale, standing alone and disconnected from other statements, and not made with fraudulent intent, and where the subject of the representations is equally open to both parties for examination, and where the party making the representations has not special or superior knowledge, and is in no sense speaking as an expert, such statements do not form a ground of action; but where the parties do not stand upon equal ground, and the situation is such that the purchaser has not the same opportunity of forming an opinion as the seller, or there are circumstances which place the seller in a position to know the condition, quality or value of the property, over and above those enjoyed by the purchaser, and the purchaser must, to a greater or less extent, depend upon the judgment or opinion of the seller in reaching his own conclusions as to whether he will make the purchase, and the seller's statements do not appear upon their face unreasonable, and the purchaser has not a fair and present opportunity to see for himself, and the seller knows that the purchaser relies or has reason to believe that he relies upon his statement, and the statements are made that he may rely upon them, then the statements as to the value may become statements of fact, and may be so found by the court or jury; and if such statements are false and made with the intent to defraud, and do defraud the purchaser, they vitiate the transaction into which they enter and subject the seller to damages.

In *Simar* v. *Canaday* (53 N. Y. 298) the court, speaking through FOLGER, J., at page 306, uses this language : " The defendant contends that the representations alleged to have been made by the

defendant were not such as to afford a ground for an action. It is first insisted that the statements as to the value of the lands and of the mortgages thereon were mere matter of opinion and belief, and that no action can be maintained upon them if false. If they were such, no liability is created by the utterance of them; but all statements as to value of property sold are not such; they may be under certain circumstances affirmations of fact. When known to the utterer to be untrue, if made with the intention of misleading the vendee, if he does rely upon them and is misled to his injury, they avoid the contract (*Stebbins* v. *Eddy*, 4 Mason, 414–423), and where they are fraudulently made of particulars in relation to the estate, *which the vendee has not equal means of knowing*, and where he is induced to forbear inquiries which he would otherwise have made and damage ensues, the party guilty of the fraud will be liable for the damage sustained" (citing several cases).

The same court, in *Hickey* v. *Morrell* (102 N. Y. 463), confirms this view, citing with approval *Simar* v. *Canaday* and *Stebbins* v. *Eddy*.

Nor is the case of *Ellis* v. *Andrews* (56 N. Y. 83) in conflict, as none of the exceptional circumstances in this case appeared in that.

The same remark is true of *Long* v. *Warren* (68 N. Y. 426), cited by the plaintiff's counsel, although the authority of that case was seriously questioned in the later case of *The Albany City Savings Institution* v. *Burdick* (87 N. Y. 40, 49).

And in *Schumaker* v. *Mather* (133 N. Y. 590, 595) the Court of Appeals cited with approval, on page 595, the views quoted from *Simar* v. *Canaday* (*supra*), and criticised those advanced in *Long* v. *Warren* (*supra*).

And in *Cullen* v. *Hernz* (13 N. Y. St. Repr. 334) Judge DANIELS says: "But while it is true that for a mere opinion expressed by one person to another as to the value of property no liability would be created against the person expressing it, when it turned out that he was mistaken, still the law will not exonerate him if he resorts to that mode of expression, knowing the opinion to be unfounded, with the object of deceiving the person to whom it may be expressed to his or her prejudice."

The fact that Johnson represented, before the execution of the

contract by the defendants, to each of them, in effect, that he was familiar with the property and its value, and that it was worth at least $2,300 per acre, stating to most of the witnesses that it was very low at that price, appears overwhelmingly from the evidence, and was admitted by Johnson upon the stand. This statement of value was coupled with the further statement that all or nearly all of the land surrounding, and in the vicinity of the property, had been taken up and was held for higher prices than the $2,300 per acre, and that the property in question was about the cheapest remaining, and the last opportunity for investment; and he went further and stated to some of the defendants that the lands so taken up embraced substantially all the land along the avenues mentioned in the contract. There can be no question but what these statements as to the surrounding property were statements of fact and not matters of opinion; and that they were relied upon by these defendants and formed a part, if not the leading inducement, in the purchase of the property.

To a person unacquainted with the locality this condition of the surrounding property would naturally have a powerful influence in determining his action; if it were true that the persons familiar with this property, and with its surroundings, had invested money to a large extent in property in the vicinity, and would not sell as low as $2,300 per acre, it would go a great ways to establish the market value of the property in question at the figure at which the defendants purchased it. So if we leave out altogether the testimony as to Johnson's statement of value, we still have a substantial representation of facts upon which the defendants relied, and had a right to rely, in the purchase of this property.

It is true that Johnson denies these statements as to the surrounding property, but his denial can have but little weight against the concurrent testimony of seven of the defendants, and Mr. Pennock, the agent of Mrs. Dysart, to the contrary.

I will assume, therefore, that Johnson made these statements as to the surrounding property. Were they true? I am satisfied they were not. The evidence clearly is that a great bulk of the land in the vicinity of said twenty-three and a half acres was not held for higher prices, and was not worth to exceed $1,000 or $1,200 per acre, and the preponderance of evidence is decidedly to the effect

that the twenty-three and a half acres were not worth the $2,300 per acre at the time of the contract, or at any time thereafter; that $1,000 to $1,200 per acre was its fair value at the time of the sale; and I am led to the conclusion that the statement of value of the property in question, under all the circumstances, and connected with the other statements as to the surrounding property went beyond the mere expression of opinion, and amounted to an affirmation of fact.

The plaintiff's contention at this point is that the value of all these lands was speculative; that the intrinsic value was only what they would be worth for farming purposes, and that the defendants understood that they were speculative, and, therefore, a statement as to their value was speculative, and not to be relied upon.

I cannot concur in this view. If this were so, then all lands that were not actually used for building purposes in cities or villages, or in their suburbs, and whose values depended upon the surroundings, and the probable use in the future to be made of them, might be regarded as speculative. So of all lands in the vicinity of cities, or improvements of various kinds, that are at present only used for farming purposes and not yet adapted to other purposes.

The present value of property depends upon what it will bring in the market, and whatever influences surround it, conditions adhere to it, or prospects attend it, that form a well-grounded belief in the minds of the public as to its value, impart a value to it. So that when a man who is familiar with real estate, as Johnson was, and engaged in the business of selling it, and assuming to have peculiar knowledge in relation to it, represents to persons, living at a great distance, who have no opportunity to examine the property or ascertain the conditions that surround it, that its value is a certain amount, it ceases to be speculative and becomes an affirmation of fact. That is, a fact based upon his knowledge and experience and judgment, all of which he is supposed to marshal together as a basis of his statement as to the value.

The counsel for the plaintiff, realizing the difficulty of applying the rule of *caveat emptor* to these defendants, says they might have gone to Buffalo while the negotiations were pending, as they had but a night to ride, and have seen this property for themselves. The law did not impose any such duty upon these defendants.

Had they gone to Buffalo they could have learned but little about it, unless they spent considerable time in the investigation of the property, its value and surroundings; and it does not lie in the mouth of the plaintiff to say that he is protected from the fraudulent statements of his agent upon any such hypothesis.

The defendants, situated as they were, had the right to rely upon these statements, and did rely upon them, and they were false. They worked an injury to the defendants. Johnson must have known they were false, or at least highly exaggerated. He assumed to state that they were true. He assumed to these defendants to know that they were true. If he did not know the exact facts that he represented were true (as he claimed upon the stand) he should have known it, and as he represented them to be true with a fraudulent intent as to these defendants, who had no opportunity to test their truth, his statements are as fraudulent and as actionable as though he knew they were not true.

The plaintiff's counsel says that no doubt Mr. Johnson puffed up the lands, or engaged in some puffing, to these defendants. Under the circumstances of this case Johnson should have indulged in no puffing. If a man has a horse before him or a farm in sight which he is trying to sell, and the purchaser being present and having an opportunity to judge of the exact value of any exaggerated statement he may make, he may be pardoned perhaps in the course of trade and in the anxiety to make a good bargain for doing a little "puffing;" but when he goes to a distant State and seeks persons who are entirely unacquainted with the property he seeks to sell, and who have to rely, and do rely, upon his word, he should indulge in no "puffing," no exaggeration, but simply tell the unvarnished truth in all particulars. Frauds of this character are entirely too common; they seem to increase with the growth of great cities and in the hot strife of booming localities, and they deserve condemnation whenever a clear case is established.

Finally, the plaintiff contends that, assuming the defendants' contention to be true, they have ratified the contract, after knowledge of the fraud. The evidence leads to a different conclusion. The defendants reaped no benefit whatever from the contract, but expended over $17,000 in the first six payments specified therein.

While there was some correspondence and acts of these defendants looking to a desire to sell the property before they had full knowledge of the fraud perpetrated upon them, and while they were in doubt as to it, they did not sell, and they took decided action as soon as the truth was learned, and repudiated the contract and refused to perform it further.

"Where a vendee has been induced to purchase property by means of fraud on the part of the vendor, mere want of diligence in discovering the fraud does not deprive the vendee of his right to rescind because thereof. He owes the fraudulent vendor no duty of active vigilance, and if he acts promptly after actual discovery of the fraud, he has a perfect right to rescind." (*Baker* v. *Lever*, 67 N. Y. 309 and 310, and cases there cited.)

The contract should be annulled and set aside for fraud, and the defendants should recover of the plaintiff the amount paid by them upon the contract, being $17,660.40, and the interest on the several payments that make up that sum, from the time of such payments respectively; and defendants should also recover costs of this action.